## A03A2038, A03A2039. PROCESS POSTERS, INC. v. WINN-DIXIE STORES, INC.; and vice versa.

(587 SE2d 211)

ELDRIDGE, Judge.

This is an appeal and cross-appeal arising from a jury verdict in favor of defendant Winn-Dixie Stores, Inc. ("W/D") in a contract action wherein plaintiff Process Posters, Inc. ("PPI") sought to recover payment for promotional materials it created for W/D's use. For the reasons that follow, we affirm the judgment of the court below in Case No. A03A2038 and dismiss Case No. A03A2039.

Leo Weber & Associates ("Weber") is a marketing and promotional firm. George Vickerman is a freelance creative designer, who had previously worked for Weber. PPI makes promotional materials and had previously done work for Vickerman.

In 1997, Weber created a supermarket promotional game and, in late 1997/early 1998, contracted with four W/D entities for its implementation in certain market areas. The express terms of the four contracts state, "Each party is an independent contract [sic] and nothing in this agreement shall be deemed to constitute either party as the agent of the other."

In August 1997, Weber had approached Vickerman to design the artwork and other promotional materials for the game. A profit sharing agreement was reached between Vickerman and Weber wherein Weber was to receive 75 percent and Vickerman 25 percent of the profits. No contract was executed between Weber and Vickerman. After Weber obtained the W/D contracts, he informed Vickerman. Vickerman did not review the contracts, but he understood that Weber was "the point man" on the project.

Vickerman then hired PPI to manufacture certain game promotional materials because "any business that [he] had that fit [PPI's] production capabilities [he] referred to Jack Spier and Process Posters." Weber approved the hire. No contract was executed between PPI and Vickerman. Vickerman instructed PPI to submit its invoices to Weber for payment upon completion of the work.

The game and promotional materials were completed by PPI and sent to W/D. The supermarket game went forward in various W/D area stores and prizes were awarded. W/D paid Weber pursuant to the terms of the contracts. Weber paid Vickerman his 25 percent share of the profits. Weber then, pursuant to submitted invoices, paid PPI with four checks drawn on First National Bank. Several months later, PPI attempted to cash two of the checks; they were returned "Account Closed." Apparently, Weber had trouble with the Internal Revenue Service, and his accounts were closed in between the time of the checks' issuance and their deposit. PPI was never paid $149,000

for its manufacture of the W/D promotional game materials. Weber admits that he owes the money to PPI.

PPI filed the instant suit, seeking payment from W/D. The crux of the suit is PPI's claim that, because of the amount of control W/D exercised over the game promotion and Vickerman's repeated contacts with W/D with regard thereto, Vickerman was W/D's agent. Thus, W/D was liable when PPI — hired by Vickerman — was not paid for the promotional materials.

Just before the start of trial, W/D argued in limine that Vickerman should not be permitted to testify that he was an "agent" of W/D. Following lengthy argument, the trial court reasoned that the express terms of the only contracts in existence disavowed any agency relationship between Weber and W/D. And Weber had hired Vickerman. Accordingly, a statement from Vickerman that he was an "agent" of W/D would be without factual basis. The court held that Vickerman could testify extensively about his relationship with W/D, but could not claim he was W/D's legal agent without first establishing some factual basis for that claim.

The first witness at trial was the president of PPI, Jack Spier, who testified Vickerman contacted him in late 1997 or early 1998; Vickerman told Spier "he had been employed by Winn-Dixie to do a promotional game for them." Evidence shows that Spier's only basis for believing an agency relationship existed between Vickerman and W/D was that, "he [(Vickerman)] told me so."

After Spier's testimony, plaintiff's counsel asked the trial court to revisit its ruling that Vickerman would not be permitted to testify he was an agent of W/D. After extensive argument, the following colloquy occurred between plaintiff's counsel and the trial court:

> [Court:] So what evidence does Vickerman have that he's an agent?
> [Plaintiff:] Based on his constant contact with Winn-Dixie and what his dealings with them were. . . . And it was the control aspect that they — it was what they made Vickerman do. It was the total . . . Judge, it can be based on circumstantial evidence.
> [Court:] So if — what I'm understanding is this is what Vickerman thinks, not what someone told him. This is what he thinks, based on control and past issue, not what someone told him, not what's in the contract; based on what he thinks?
> [Plaintiff:] Yes.
> [Court:] He can just testify as to what the facts are. He can't stick [W/D] for another 145 grand, when they've already paid it [to Weber]. That is not fair, that is not fair, and if

that gets taken up and I'm wrong, that's great, but I have a real strong sense of what's fair, and that ain't.

Thereafter, Vickerman testified about the amount of control W/D exercised over the game promotion, including approval of game content and anything to be distributed to its customers; approval of art work; contacting individual vendors regarding participation in the game; dictating what suppliers to use in certain areas; paying for the game prizes; advertising the game; taking out insurance to protect it from suppliers; and approval of the time periods for the game promotion. Vickerman further testified that he had "conversations with Winn-Dixie representatives throughout the process of putting together the game." Vickerman testified that W/D was "involved in everything. They weren't standing over my shoulder, but they were burning the telephone lines up."

From Vickerman's testimony it also appears that Weber was "the main liaison" with W/D on the game promotion, and Vickerman knew he was "subordinate" to him. It was Weber, not Vickerman, who was responsible for obtaining approval from W/D about game content and art work; Weber was contacted by W/D regarding certain suppliers to use in certain areas; Weber told Vickerman what invoices to prepare and where to send them; and Weber negotiated the prices for the prizes and discussed their award with W/D. In addition, without assistance from Vickerman or Weber, W/D directly contracted with agencies for advertising, directly contracted with vendors to participate in the game, and directly purchased protective insurance. The record shows that Vickerman's repeated contact with W/D was in the nature of "expertise, guidance in conduct of the Game and intangible professional advice and promotional services," pursuant to the contracts between Weber and W/D, as well as Weber's agreement with Vickerman.

Vickerman's testimony also showed that, in addition to PPI, he hired at least two other businesses to do work on the W/D game project; Vickerman, however, paid the other two businesses and did not claim he was acting as an agent for W/D at the time of the hires. From the testimony directed toward payments, it appears that W/D was to pay Weber pursuant to the written contracts, Weber and Vickerman were then to pay their vendors, and the remainder was to be split pursuant to the profit sharing agreement between Weber and Vickerman.

At trial, Leo Weber testified via video deposition. He stated that, specifically based upon the express terms of the contracts with the W/D entities, "I was not an agent of Winn Dixie." In addition, Weber testified that he and Vickerman were together at the meetings with the heads of the W/D entities, and no one ever made any statement to

the effect that Vickerman was authorized to enter into contracts that would be binding on W/D.

Following the close of evidence and the charge of the court, the jury determined that no agency relationship existed between Weber and W/D, and consequently, it returned a verdict for W/D. *Held*:

## Case No. A03A2038

1. In its first claim of error, PPI contends the trial court erred in precluding Vickerman from testifying that he was an agent for W/D.

Generally speaking, it is this Court's responsibility to affirm what was done correctly and reverse what was done erroneously. We attempt to do so dispassionately, as "[n]o greater good could be done than by withdrawing emotion as a force from the administration of justice."[1] We, however, are not immune to a job done exceptionally well. In that regard and from necessity engendered by appellate review, we have had the opportunity to consider the efforts of the trial court in making a determination on the instant issue, the acknowledged "heart" of PPI's case, and are moved to recognize them. The fairly voluminous record shows numerous arguments, counter-arguments, and selective case law repeatedly presented solely on this issue. The trial court not only carefully considered same, but asked for more: "Now, y'all feel free to argue with me. You will not hurt my feelings." Pursuant to requested argument, the trial court sifted through legal theories ranging from the parol evidence rule to hearsay to "ultimate issue" opinion evidence. In the end, the trial court stayed the factual course, determining,

> I don't know; there may be thousands of cases one way or the other, but I could just tell that allowing a witness to say: I'm an agent; I told him I was an agent, so I am now binding someone without proving the stuff that is necessary to establish that [agency] is fundamentally unfair and it isn't going to happen with me on watch.

Obviously, praise of one court's performance is not an indictment of another's but, as here, simply renders especially easy our application of the longstanding principle that,

> it [is] quite clear that the admission of evidence is generally committed to the sound discretion of the trial court, whose determination shall not be disturbed on appeal unless it amounts to an abuse of discretion. This is so because trial

---

[1] Bleckley, C. J., 9 Ga. Bar Assn. Annual Report, pp. 54, 61 (1887).

courts, unlike appellate courts, are familiar with a piece of litigation from its inception, hear first-hand the arguments of counsel, and consider disputed evidence within the context of an entire proceeding. Hence, it is only natural that an appellate court should defer to the trial court with regard to the admission of evidence, unless the lower court's decision is so flawed as to constitute an abuse of discretion.[2]

We find no abuse of discretion.

OCGA § 10-6-1 explains that "[t]he relation of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf."

> The distinguishing characteristic of an agent is that he is vested with authority, real or ostensible, to create obligations on behalf of his principal, bringing third parties into contractual relations with him.[3]

A careful reading of the record before us shows not a single factual basis upon which a jury could find that, in law, Vickerman was an "agent" of W/D who could contractually bind W/D to third parties, and Vickerman points to no such facts. As a matter of law, Vickerman's relationship with W/D was created only through his agreement with Weber. No evidence showed that Vickerman performed any service for W/D that was outside the parameters of (a) the contracts executed between Weber and W/D, and (b) the agreement between Vickerman and Weber in furtherance of the contracts.[4] "Where there is no evidence . . . that a principal authorized someone to act as its agent, agency cannot be proven by declarations of the alleged agent."[5] Thus, absent any factual basis for a statement that Vickerman was, in law, an agent of W/D, that statement would be "merely an erroneous conclusion."[6] Consequently, under the facts of

---

[2] (Punctuation and footnotes omitted.) *Cooper Tire &c. Co. v. Crosby*, 273 Ga. 454, 456 (2) (543 SE2d 21) (2001).

[3] (Citation and punctuation omitted.) *Physician Specialists in Anesthesia v. Wildmon*, 238 Ga. App. 730, 732 (1) (a) (521 SE2d 358) (1999); accord *Stallings v. Sylvania Ford-Mercury*, 242 Ga. App. 731 (533 SE2d 731) (2000).

[4] For these reasons, we reject PPI's contention by brief that Weber was somehow a "third party" or "outsider" as to Vickerman's relationship with W/D.

[5] (Citation omitted.) *T & R Custom v. Liberty Mut. Ins. Co.*, 227 Ga. App. 144, 145 (488 SE2d 705) (1997); see also *Davis v. Metro. Life Ins. Co.*, 196 Ga. 304 (26 SE2d 618) (1943); *Hornsby v. Phillips*, 190 Ga. App. 335, 341 (378 SE2d 870) (1989) (agency cannot be proved by declarations of alleged agent).

[6] *Physician Specialists in Anesthesia v. Wildmon*, supra at 733.

this case, the trial court did not err by keeping such statement from the jury "on his watch."

Likewise, we find no error in the trial court's determination that Leo Weber could testify as to his nonagency status. "[O]ne who is a party to the relationship (principal or agent) may testify as a *fact* as to the existence or non-existence of the relationship."[7] A statement of "fact," of course, must have some supporting basis.[8] And Weber's statement, unlike Vickerman's, was supported by the four contracts with W/D that — by their very terms — disavowed any agency relationship between Weber and W/D. Additionally, Weber was present with Vickerman at the meetings with the W/D entities. He could testify about what happened therein, including that he knew of nothing that occurred which would authorize either Vickerman or him to contract on W/D's behalf; indeed, Vickerman does not even claim that such direct evidence exists. On this basis, the trial court did not err in permitting Weber's testimony regarding agency.

2. Vickerman claims several errors in the trial court's jury instructions. We have reviewed the charge of the court and find it succinct and correct. With regard to Vickerman's specific contentions, we find as follows:

(a) There is no merit to Vickerman's claim that the court failed to instruct the jury "that the Weber contracts did not control or dictate the legal relationship between Vickerman and Winn-Dixie." The court charged the jury that agency could be established by contract *or* "by the principal's conduct and course of dealings." The jury was instructed that a written contract of agency "is not essential to the creation of the principal-agent relationship." Finally, the court charged the jury that the written contracts "are not the only factor you may use in your determination of whether or not an agency relationship was created." "It is axiomatic that a jury charge need not be given in the exact language requested if the charge as given clearly covers the circumstances of the case."[9]

(b) There was no error in the trial court's refusal to charge the jury that "a person may be an independent contractor and at the same time act as an agent for a particular purpose." The court charged on agency law and on the law relating to independent contractors. There is no evidence — and Vickerman never claimed — that he acted as *both* an agent and an independent contractor. Instead, he claimed solely that an agency relationship existed

---

[7] (Citation and punctuation omitted; emphasis in original.) Id.

[8] See, e.g., *Crowe v. State*, 265 Ga. 582, 591 (15) (458 SE2d 799) (1995) ("[T]he trial court also was authorized to find that there was no factual basis to support the assertions in [the] motion.").

[9] (Citation omitted.) *Powell v. Amin*, 256 Ga. App. 757, 763 (4) (569 SE2d 582) (2002).

between W/D and himself that obligated W/D for his actions. W/D's contrary claim, i.e., that Vickerman's acts were undertaken solely as an independent contractor, provided no evidence to support a jury charge that Vickerman assumed a dual role. Accordingly, the requested charge was not tailored to the evidence.[10]

(c) It was not error to refuse to charge the jury that "a principal need not be aware of representations by an agent to be bound by the representations." While a correct statement of the law, this charge did not address a disputed issue in the instant case. W/D did not defend on the basis of such lack of knowledge. W/D's defense was lack of agency. The jury found no agency relationship existed. Accordingly, the failure to give the requested charge demonstrates neither error nor harm.

### Case No. A03A2039

Our decision in Case No. A03A2038, supra, renders moot the issue raised in the cross-appeal by Winn-Dixie, Inc. An appeal may be dismissed "[w]here the questions presented have become moot."[11] Therefore, the instant appeal is dismissed.

*Judgment affirmed in Case No. A03A2038. Appeal dismissed in Case No. A03A2039. Johnson, P. J., and Mikell, J., concur.*

DECIDED SEPTEMBER 4, 2003 —
RECONSIDERATION DENIED SEPTEMBER 17, 2003.

*Caldwell & Watson, Harmon W. Caldwell, Jr., Michael R. Merlino II, Christopher J. McFadden*, for appellant.

*Fain, Major, Wiley & Brennan, Gene A. Major, Sheri L. Smith*, for appellee.

---

[10] *Wadkins v. Smallwood*, 243 Ga. App. 134, 141 (5) (d) (530 SE2d 498) (2000).

[11] OCGA § 5-6-48 (b) (3); see *Maxwell v. Cronan*, 241 Ga. App. 491, 493 (2) (527 SE2d 1) (1999).